UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| JANET TIDRICK; PAM'S SUNNYSIDE GREENHOUSES AND FLOWER SHOP; and JAMES TIDRICK, | Case No. 6:20-cv-00472-MK **OPINION AND ORDER** |
| Plaintiffs, | |
| vs. | |
| EAGLE WEST INSURANCE COMPANY, | |
| Defendant. | |

_____

**KASUBHAI,** United States Magistrate Judge:

Plaintiffs James Tidrick, Janet Tidrick, and Pam's Sunnyside Greenhouse and Flower Shop bring this action alleging claims arising from an insurance policy dispute with Defendant Eagle West Insurance Company ("EWIC"). Compl., ECF No. 1. EWIC moved for summary judgment. Def.'s Mot. Summ. J., ECF No. 49 ("Def.'s Mot."). Plaintiffs opposed that motion. Pls.' Response, ECF No. 59. All parties consented to jurisdiction by a U.S. Magistrate Judge. ECF No. 42; ECF No. 52. For the following reasons, the Court GRANTS in part and DENIES in part EWIC's motion for summary judgment.

**BACKGROUND**

Plaintiffs owned and operated Pam's Sunnyside Greenhouse and Flower Shop, a gardening business. Compl. ¶ 2, ECF No. 45. Plaintiffs were insured by Defendant Eagle West Insurance Company ("EWIC") starting in 2015 after their previous insurer, Florist Mutual

Insurance Company transitioned Plaintiffs' policy to EWIC. Dec. Janet Tidrick ¶ 2–3, ECF No. 62. At the time Plaintiffs' insurance policy was transferred to EWIC, Plaintiffs confirmed with their new insurance agent that their policy would have "special coverage," which is an "all risk" coverage. Tapper Decl., Ex. 32, ECF No. 60-4–5; Tapper Decl., Ex. 7, ECF No. 60-137. On February 23, 2019, a snowstorm caused damage to many of Plaintiffs' buildings and structures. Compl. ¶¶ 10-11, ECF No. 45. Plaintiffs initiated an insurance claim with Defendant, their insurance provider. Tapper Decl., Ex. 35, ECF No. 60-1. Initially, Defendant, in a letter, told Plaintiffs that there were "questions . . . as to whether [Plaintiffs'] policy will cover all or a portion of the damage [they] reported." *Id.* at 2. On April 22, 2019, Defendant initially denied Plaintiffs' claim based on Defendant's error that Plaintiffs had "basic" rather than "special" coverage. Tapper Decl., Ex. 34, ECF No. 60-1; Tapper Decl. Ex. 63, ECF No, 60-3. Basic coverage would not have covered losses resulting from "the weight of snow," while the "special," or "all risk," coverage would. *Id.* The letter denying coverage asked Plaintiffs to supply EWIC with any further information about their policy if they disagreed with EWIC's finding against coverage. Leporati Decl., Ex. 8, ECF No. 50-3. In response, Plaintiffs went "back through years of communications with [their] insurance agent to find documents proving that [they] actually had the insurance that [they] purchased." Janet Tidrick Decl. ¶ 5, ECF No. 62.

On May 1, 2019, Defendant made its first payment of $15,645 to Plaintiffs to cover the demolition cost for a partially collapsed structure that posed a safety hazard. Leporati Decl., Ex. 2, ECF No. 50-4. On May 8, EWIC was made aware of a potential "mistake . . . regarding the [Plaintiffs'] policy." Leporati Decl., Ex. 12, ECF No. 50-1. After investigating the policy mistake, on May 30, EWIC's underwriting department confirmed there had been a mistake on the coverage form designating the coverage as "basic" rather than "special" and informed

EWIC's adjuster that the policy would be reformed retroactively. Leporati Decl. ¶ 27, ECF No. 50. That same day, EWIC's adjuster, Kathy Lewis, emailed Dean Knowles, the national general adjuster that EWIC obtained, to explain that the policy was revised and EWIC would be providing coverage for Plaintiffs' losses. Tapper Decl. Ex. 27, ECF No, 60-1. The email directed Mr. Knowles to proceed with preparation of damage estimates. *Id.*

Plaintiffs' EWIC Insurance policy provides that at the time of loss or damage, EWIC will pay the insured the "actual cash value" ("ACV") for covered damage. Leporati Decl., Ex. 1, ECF No. 50-37–39. Then, "upon completion of repairs or replacement of the damaged property," EWIC would pay the least of: (a) the policy limits; (b) "the cost to repair or replace with comparable material or quality with property used for the same purpose;" or (c) "the amount actually spent that is necessary to repair or replace the lost or damaged property." *Id.*

On July 23, 2019, EWIC sent a letter informing Plaintiffs that EWIC was sending a payment of $68,680.74 to them, which was EWIC's calculation of the ACV of Plaintiffs' losses. Leporati Decl., Ex. 2, ECF No. 50-5–6; Leporati Decl., Ex. 13, ECF No. 50-4–5. On August 19, Defendant made an $18,900 payment to Plaintiffs as an adjustment for cost of repair for several repaired structures. Jones Decl. Ex. 17, ECF No. 51-2; Leporati Decl., ¶ 34, ECF No. 50. Finally, on October 9, Defendant made its last payment to Plaintiffs, a check for $43,505.54. Leporati Decl., Ex. 18, ECF No. 50. This final payment was for "covered costs of repair," which Defendant made "in good faith, prior to completion of repairs." Leporati Decl., Ex. 17, ECF No. 50. Between the four payments, Defendant paid Plaintiffs a total of $146,731.28. Def.'s Mot. 9.

Throughout the adjustment period, Plaintiffs and Defendant attempted to reach agreements on the values of the loss. The parties' adjusters were able to come to agreement on the cost of several buildings, but not others. Compl. ¶ 11, ECF No. 45. The primary

disagreements between the parties involve the replacement costs of buildings 602, 208, 201, 209, and the "boiler room annex." The differences in replacement cost estimates for these buildings are as follows:

| Building | EWIC Estimate | Insured Estimate | Difference |
|---|---|---|---|
| 208 | $10,788.88 | | |
| 201 | $2,549 | $138,278 | -$73,551.2 |
| 209 | $3,695 | | |
| Boiler Room Annex | $47,694 | | |
| 602 | $2,117.96 | $38,357.37 | -$36,239.41 |

The insured's estimates for buildings 208, 201, 209, and the boiler room annex are consolidated because they received a bid from McKenzie Commercial for replacement of all four structures. Jones Decl. Ex. 5, ECF No. 51-24–25.

On November 6, 2019, disagreeing with EWIC's final payment amount, Plaintiffs made a demand for appraisal. Compl. ¶ 29, ECF No. 45; Leporati Decl., ¶ 39, ECF No. 50. Plaintiffs' policy states that: "if we and you disagree on the value of the property or the amount of loss ("loss") both parties may agree to an appraisal of the loss and to be bound by the result of that appraisal." Leporati Decl., Ex. 1, ECF No. 50-6. Defendant retained an appraiser who, on December 5, 2019, sent a letter to Plaintiffs' public adjuster stating that Defendant was ready to commence appraisal but that it would limit the scope of the appraisal, excluding buildings 208, 602, 604, and the "boiler room annex." Tapper Decl., Ex. 40, ECF No. 60; Pls.' Resp. 6, ECF No. 59. Plaintiffs allege that these excluded buildings "made up the bulk of the dispute between the parties." Pls.' Resp. 6, ECF No. 59. Despite Defendant's limitation of the scope of the appraisal, it did pay the cost of repairing building 604. Jones Decl., Ex. 1, ECF No. 51-3.

Defendant's letter regarding the scope of the appraisal stated that the scope limitation was due to "coverage and scope disputes." Tapper Decl., Ex. 40, ECF No. 60. On December 4, 2019, the day before Defendant's appraiser sent the above correspondence, the appraiser sent an email to Defendant's claim adjuster which read: "[a]ttached please find our 1st report. They may lose interest or seek a reasonable settlement once they know the big ticket items are off the table." Tapper Decl., Ex. 42, ECF No. 60. Defendant's appraiser heard back from Plaintiffs' public adjuster who apparently indicated that if Defendant limited the scope of the appraisal, then Plaintiffs "would move to suit." Tapper Decl., Ex. 43, ECF No. 60. A few days later, Defendant's appraiser followed up with its claim adjuster in an email that said "I have received no response from the attorney so far. I kind of doubt we will, as most of these growers do not like attorneys." Tapper Decl., Ex. 47, ECF No. 60. Plaintiffs withdrew their demand for appraisal because "the appraisal would be pointless" given the scope limitations. Leporati Decl., Ex. 20, ECF No. 50-1.

Plaintiffs testified that as a result of Defendant's delay in accepting the claim, alleged undervaluing of the claim, and failure to appraise the full scope of loss, they were unable to run their business at full capacity and were prevented from selling plants to customers. Jim Tidrick Decl. ¶ 4.  Specifically, Plaintiffs testified that they were unable to fill orders from one of their long-standing customers, Gray's Gardens. *Id.* at ¶ 5. Defendant, however, introduced evidence that Plaintiffs did not have any written contract with Gray's. Jones Decl. Ex. 6, ECF No. 51-27–32. Invoices show completed transactions between Plaintiffs and Gray's both before and after the snow event. Jones Decl. Ex. 19, ECF No. 51. Plaintiffs were able to deliver the products ordered in those invoices and were paid by Gray's for the orders. Jones Decl. Ex. 6, ECF No. 51-32–33. Plaintiffs testified, however, that they had a standing, verbal contract with Gray's to grow plants

for them each year, and that there was some loss of business from Gray's due to the snow damage. Jones Decl. Ex. 5, ECF No. 51-28–30. Ultimately, Plaintiffs testified that because they were unable to run their business, they were forced to sell it. James Tidrick Decl. ¶ 7. Plaintiffs testified that because of Defendant's conduct, they have experienced stress, headaches, tension, and sleeplessness. Tapper Decl., Janet Tidrick Depo., ECF. No. 60-73.

## STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630.

## DISCUSSION

Plaintiffs assert three claims for relief. First, Plaintiffs assert a breach of contract claim alleging that (1) EWIC undervalued their losses; (2) failed to appraise the full scope of their losses; and (3) caused unreasonable delay in making payments on their claim. Compl. ¶¶ 7–19, 27–34, ECF No. 45. Second, Plaintiffs assert that EWIC breached the duty of good faith and fair dealing. *Id.* at 20–26. Finally, Plaintiffs assert a negligence *per se* claim based on EWIC's alleged violation of ORS 746.230. *Id.* at 35–40. EWIC moves for summary judgment on all three claims. Def.'s Mot. 1, ECF No. 49. In the alternative, EWIC asks for an order pursuant to Fed. R. Civ. P. 56(g) finding certain facts are undisputed and are established as a matter of law. *Id.*

### I.      56(g) Motion

Defendant's motion for a Fed. R. Civ. P. 56(g) order establishing certain undisputed facts as a matter of law is granted with respect to the following facts: (1) EWIC paid Plaintiffs $146,731.28; (2) Plaintiffs exercised exclusive control over the use of those payments; (3) Plaintiffs did not perform or complete repairs on buildings 208, 201, 209, or the Boiler Room Annex; and (4) Plaintiffs made no further repairs after EWIC's final payment.

### II.     Loss of Income Damages

As a threshold matter, the court will first address whether loss of income damages are available for Plaintiffs' claims. Plaintiffs claim lost income damages in their breach of contract and breach of the duty of good faith and fair dealing claims. Compl. ¶¶ 16, 24, ECF No. 45. Plaintiffs claim $20,000 in damages for lost income. *Id.* Defendant argues that Plaintiffs failed to present evidence of lost *profits* as the law requires. The Court agrees.

Plaintiffs, in a breach of contract case, may recover foreseeable loss of income damages caused by the breach. Lost income damages are a type of consequential damages, which are

available if the defendant "knew of the facts making the loss foreseeable at the time the contract was made." *Siegner v. Interstate Production Credit Assn.*, 109 Or. App. 417, 436 (1991). The party seeking to recover lost income bears the burden of proving it. *Peterson v. McCavic*, 249 Or. App. 343, 354 (2012). Loss of income damages must be established by evidence that can determine both their existence and their amount with "reasonable certainty." *Bixler*, 49 Or. App. at 202. Reasonable certainty is "not a demanding standard," requiring "only reasonable probability, not absolute certainty." *Summa Real Estate Group, Inc. v. Horst,* 303 Or. App. 415, 423 (2020) (quoting *City of Eugene v. Monaco*, 171 Or. App. 681, 688 (2000)). At a minimum, however, the evidence "must not allow the jury to freely speculate as to the amount of damages" for loss of profits. *Pearson v. Schmitt*, 259 Or. 439, 442 (1971).

Importantly, only lost net profits are recoverable as lost income. *Cruz Development, Inc. v. Yamalova*, 174 Or. App. 494, 499 (2001). Evidence that identifies only a plaintiff's lost revenue is not sufficient to allow a jury to calculate losses without engaging in speculation. *Id.* For a question of lost profits to go to the jury, a plaintiff must submit evidence of the expenses they would have incurred to earn the alleged lost revenue. *Summa Real Estate Group, Inc.*, 303 Or. App. at 424.

EWIC argues that Plaintiffs have not met their burden of showing lost net profits. Def.'s Reply 9, ECF No. 68. The parties have provided briefing on whether Plaintiffs' "handshake deal" with their client Gray's was sufficient proof to establish $20,000 in lost revenue. Whether it was sufficient is immaterial where, as here, there is not accompanying evidence of operating expenses to establish lost profits. Plaintiffs have provided no such evidence from which a jury could estimate lost profits. Accordingly, the Court grants summary judgment in favor of Defendant with respect to Plaintiffs' claims for lost income damages.

Plaintiffs' breach of the duty of good faith and fair dealing claim only alleged $20,000 in loss of income damages. Given that Plaintiffs have therefore not alleged any other available damages, the Court grants summary judgment in Defendant's favor on Plaintiffs' breach of the duty of good faith and fair dealings claim.

Additionally, Plaintiffs' breach of contract "unreasonable delay" theory is only associated with lost income damages. Even if the court were to find a question of material fact on the issue of unreasonable delay, without lost income damages, Plaintiffs have no recoverable remedy. Accordingly, the Court grants summary judgment in Defendant's favor on Plaintiffs' breach of contract claim arising from Defendant's alleged unreasonable delay.

**III.    Breach of Contract**

Plaintiffs allege that Defendant breached their insurance policy under two surviving theories: (1) that Defendant undervalued and underpaid their insured losses and (2) that Defendant failed to appraise the full scope of their loss.

**A.    Undervaluation of Losses**

Plaintiffs allege that EWIC undervalued their lost property and therefore underpaid their covered losses, amounting to a breach of contract. Compl. ¶¶ 13, 32, ECF No. 45. EWIC argues that Plaintiffs' claim that EWIC undervalued their property is based on *replacement cost estimates* for structures that were never replaced, and per the terms of the policy EWIC is not required to pay replacement costs until property is replaced. Def.'s Mot. 13, ECF No. 49. Accordingly, EWIC asserts that it did not breach the terms of the policy. *Id.* Plaintiffs argue that they did not replace the structures at issue because EWIC acted in bad faith in valuing the losses, and thus the doctrine of prevention allows Plaintiffs to seek recovery costs even for structures

that were not replaced. Pls.' Resp. 11, ECF No. 59. The Court agrees with Plaintiffs that this claim cannot be resolved on Summary Judgment.

Plaintiffs acknowledge that under the terms of their policy, replacement costs are not recoverable from Defendant until "the lost or damaged property is actually repaired or replaced." *Id.* at 12. That is, replacement is a "condition precedent" necessary to obtaining replacement cost benefits. This is common in insurance policies, and Oregon law has confirmed that there is no duty to pay more than Actual Cash Value until repairs are completed. *Higgins v. Insurance Co. of N. America,* 256 Or. 151, 164 (1977). However, under the doctrine of prevention, "where the conduct of the defendant has prevented the performance of a contract provision by the plaintiff," the plaintiff is excused from performing under that provision. *Anderson v. Allison*, 471 P.2d 772, 774 (Or. 1970).

Plaintiffs argue that Defendant's lack of good faith in reaching a fair valuation of replacement costs for their structures prevented them from actually replacing the structures. Under the prevention doctrine, this would excuse Plaintiffs from their obligation to replace structures before replacement costs can be obtained.

Viewing the facts in the light most favorable to the non-moving party, a genuine issue of material fact exists as to whether Defendant's conduct prevented Plaintiffs from replacing certain structures. Here, the following evidence supports a conclusion that Defendant prevented Plaintiffs from replacing structures. First, Defendant's estimate for the total replacement costs of buildings 208, 201, 209, and the boiler room annex was nearly 50% lower than the bid that Plaintiffs received from McKenzie Commercial. Jones Decl., Ex. 1, ECF No. 51-3. Second, emails that Defendant sent later over the scope of appraisal sufficiently raise questions about whether Defendant was acting fairly toward Plaintiffs throughout the entire claim adjustment

process. Defendant's adjuster and appraiser corresponded about taking "big ticket" items off the table and about Plaintiffs not pursuing litigation. Tapper Decl., Ex. 43, 47, ECF No. 60. Finally, Mr. Tidrick testified that Plaintiffs "would not enter that agreement with [their contractor, McKenzie Commercial] unless [Plaintiffs] had the blessings of the insurance company." Jones Decl. Ex. 5, ECF No. 51-25. From that evidence, a reasonable jury could conclude that Defendant caused Plaintiffs not to replace the structures by creating a claims environment that would discourage the Plaintiffs from pursuing the claims at all.

> **B.    Failure to Appraise**

Plaintiffs allege that EWIC refused to appraise the value of their property, amounting to a breach of contract. Compl. ¶¶ 27–34. Specifically, Plaintiffs allege that Defendant sabotaged the appraisal in bad faith when it limited the scope of the appraisal. Pls.' Resp. 5–6. Defendant makes several arguments. First, Defendant claims that because Plaintiffs withdrew their request for appraisal, this claim is moot. Def.'s Mot. 21. Second, Defendant argues that because Plaintiffs withdrew their appraisal demand and an appraisal never happened, there is no way to calculate damages. *Id.* Third, Defendant argues that there is no causal nexus between their disagreement over the scope of the appraisal and the damages that Plaintiffs allege. *Id.* Finally, Defendant argues that in any event, Plaintiffs' request for appraisal was premature because they did not replace certain buildings before requesting appraisal over replacement cost disagreements. *Id.* at 21–22. The Court addresses each argument in turn.

> 1.    <u>Mootness</u>

Defendant argues that Plaintiffs' claim for failure to appraise is moot because Plaintiffs withdrew their demand for appraisal.

When a federal court is sitting in diversity, state substantive law governs the claim. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). It follows that we look to Oregon law to determine whether a claim is moot. In Oregon, a claim is moot when there is no live adversity between parties and "the court's decision will no longer have a practical effect on the rights or obligations of a party." *Oregon School Activities Ass'n v. State Bd. of Educ.,* 244 Or. App. 506, 510 (2011). A court's decision no longer has a practical effect when "an event occurs that render[s] it impossible for a court to grant effectual relief." *Columbia Crossings, LLC v. Mathis*, 30 Or. App. 637, 640 (2022). Oregon courts have recognized that the possibility of being awarded financial damages may keep alive an otherwise moot claim. *See, e.g., 7455 Inc. v. Tuala Northwest, LLC*, 274 Or. App. 833, 838 (2015); *Rains v. Stayton Builders Mart, Inc.*, 359 Or. 610, 625 (2016).

For example, in *7455 Inc. v. Tuala Northwest, LLC*, the plaintiffs brought a claim for a prescriptive easement. 274 Or. App. at 387. The defendants moved to dismiss the claim as moot because the plaintiff had already vacated the property, and thus a prescriptive easement "would have no practical effect on [the p]laintiff's ability to use the . . . property." *Id.* The court found that the parties' interests remained "actively adverse" because although the plaintiff had vacated the property, the plaintiff was also seeking economic damages. *Id.* at 838. While the prescriptive easement would no longer have a practical effect, whether the plaintiff had a prescriptive easement would determine the availability of economic damages. *Id.* Thus, the court ruled the plaintiff's claim was not moot. *Id.*

Similarly here, Plaintiffs' claim for financial damages keeps their otherwise moot claim for failure to appraise "actively adverse." Like the plaintiff in *Tuala* who vacated the property, the Tidricks' withdrawal of their demand for appraisal appears at first glance to render their

claim moot. However, because Plaintiffs could be awarded money damages, it is possible for the court to grant effectual relief. Plaintiffs' failure to appraise claim is not moot.

2.    <u>Appraisal Process and Calculating Damages</u>

Defendant next argues that because appraisal is a process that was never finished, damages cannot be calculated. Defendant contends that Plaintiffs are seeking damages "as though an appraisal award had been entered in Plaintiffs' favor." Def.'s Mot. 21.

Appraisal is a permissive procedure under Plaintiffs' policy. Leporati Decl. Ex. 1, ECF No. 50-35. Either the insured or the insurer *may* demand appraisal if there is a disagreement over the value of property or amount of loss, but it is not a prerequisite to bringing a claim. *Id.* It is true that there was no cost agreement reached by appraisal in this case because Plaintiffs withdrew their demand for appraisal. However, it does not follow that a jury's award would be "as though an appraisal award had been entered in Plaintiffs' favor." If an appraisal award were the only way to establish damages for undervaluing insured losses, then appraisal would be a prerequisite to filing such a claim.

A reasonable trier of fact could review Plaintiffs' and Defendant's replacement cost estimates along with the other evidence in the record and conclude that Plaintiffs suffered some economic damage as a result of Defendant's failure to appraise the loss.

3.    <u>Causal nexus between appraisal scope and economic damages</u>

Defendant next contends that Plaintiffs cannot support a claim that their alleged damages were the *result of* Defendant's disagreement regarding the scope of the appraisal. Def.'s Mot. 21. Generally, Oregon law does not permit a party to recover "where the causal nexus between the defendant's conduct and the plaintiff's injury is speculative or uncertain." *Classen v. Arete NW, LLC*, 254 Or. App. 216, 222. The existence and amount of economic damages must be

established with "reasonable certainty," and without "speculation, conjecture[,] or surmise." *Newell v. Weston*, 150 Or. App. 562, 582 (1997).

Assuming that Plaintiffs could prove that Defendant breached the policy by failing to appraise the full scope of the loss, the court rejects Defendant's argument that there is no causal nexus between that breach and Plaintiffs' claimed damages. Had Defendant fairly appraised the full scope of Plaintiffs' losses, the parties may have reached an agreement that would have enabled Plaintiffs to replace certain structures. And as discussed above, where Defendant's conduct prevented Plaintiffs from replacing structures, replacement costs could still be obtained. This renders a question of fact for the jury.

4.    Whether Appraisal was Premature

Finally, Defendant contends that Plaintiffs' demand for appraisal was, in any event, premature because Plaintiffs requested an appraisal for replacement cost for structures that were not at the time, and never were, replaced. Def.'s Mot. 21. The appraisal provision in Plaintiffs' policy provides, in its entirety:

> "If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select and umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will: (a) Pay its chose appraiser; and (b) Bear the other expenses of the appraisal and umpire equally. If there is an appraisal, we will still retain our right to deny the claim."

Leporati Decl. Ex. 1, ECF No. 50-35. There is nothing on the face of the policy indicating that Plaintiffs were not permitted to request appraisal to come to an agreement on replacement costs

prior to replacing property. Defendant does not offer evidence showing that this was the reason the appraisal scope was limited in the first instance. The court rejects Defendant's argument.

This court denies defendant's motion for summary judgment with regard to Plaintiffs' breach of contract claim.

## IV.    Negligence Per Se

Plaintiffs' fourth claim for relief alleges a negligence *per se* violation and seeks noneconomic damages. Compl. ¶¶ 35–40, ECF No. 45. Plaintiffs allege that Defendant violated ORS 746.230, the Unfair Claims Practices Act. Compl. ¶ 36.

To prevail on a claim of negligence *per se*, a plaintiff must "allege that (1) defendants violated a statute [or rule]; (2) that plaintiff was injured as a result of that violation; (3) that plaintiff was a member of the class of persons meant to be protected by the statute [or rule]; and (4) that the injury plaintiff suffered is of a type that the statute [or rule] was enacted to prevent." *Abraham v. T. Henry Const., Inc.*, 230 Or. App. 564, 573 (2009) (quoting *McAlpine v. Multnomah County*, 131 Or. App. 136 (1994), *rev. den.*, 320 Or. 507 (1995)) (emphasis omitted).

Defendant argues that ORS 746.230 does not allow Plaintiffs to bring a negligence *per se* claim for noneconomic damages, and if it does, Plaintiffs do not have the requisite injury to recover emotional distress damages. *Id.* at 32-35. The Oregon Court of Appeals' ruling in *Moody v. Oregon Community Credit Union*, which held that emotional distress damages could be awarded in a negligence *per se* claim against an insurance company. 317 Or. App. 233, 248, review allowed, 369 Or. 855 (2022), resolves the first question. *Moody* unambiguously held that a violation of ORS 746.230 can give rise to a negligence per se claim.

This Court next must decide whether Plaintiffs' injuries are sufficient to sustain a claim for emotional distress damages under ORS 746.230. This Court concludes they are.

Defendant argues that the Plaintiffs' symptoms from experiencing emotional distress do not qualify under the physical impact rule. This Court finds that the evidence in the record supports allegations of emotional distress that qualify under the physical impact rule.

Generally, Oregon courts only allow compensation for serious emotional distress. *Philibert v. Kluser,* 360 Or. 698, 713 (2016). That emotional distress must be accompanied by some physical impact, unless the emotional distress is alleged by a bystander to a negligent event. *See id.* at 708-710, 716. The physical impact rule requires an actual physical injury to support damages for emotional distress in a negligence claim. *Paul v. Providence Health Sys.-Oregon,* 351 Or. 587, 597 (2012) (noting that Oregon courts consistently reject "claims for emotional distress damages caused by a defendant's negligence, in the absence of any physical injury"). The level of injury must have "some perceptible physical effect on a plaintiff." *Chouinard v. Health Ventures*, 179 Or.App. 507, 515 (2002). In devising that standard, the outer limits of the level of physical effect were not established. *Simons v. Beard,* 188 Or. App. 370, 376, (2003).

Here, Plaintiffs allege and offer evidence in the summary judgment record that they suffered substantial emotional and physical distress including tension, sleeplessness, anxiety, and headaches. Compl. 9, ECF No. 45; Pl's Resp. 18, ECF No. 59 (citing to Tidrick Depo. 72:19 – 73:23). The Plaintiffs' claimed injuries were not mere annoyance, agitation or expressions of anger. The Court recognizes that such claimed emotional harm would fall below the minimum required to meet the physical impact rule. Here, however, the Defendant appears to presume without offering any evidence that the injuries Plaintiffs described possess no physical aspect. Tension, headaches, and anxiety may well reflect physiologically perceptible changes sufficient to be an injury here. It remains a question for the jury.

The parties have raised and argued whether exceptions to the physical impact rule are available.  Even though this Court has concluded that there is sufficient evidence of physical injury for the jury to consider, the Court also concludes that to the extent a physical injury could not be established, certain exceptions apply.  In *Hammond v. Cent. Lane Commc'ns Ctr.,* the Oregon Supreme Court identified three exceptions to the physical impact rule: the rule does not apply (1) "where the defendant intended to inflict severe emotional distress"; (2) "where the defendant intended to do the painful act with knowledge that it will cause grave distress, when the defendant's position in relation to the plaintiff involves some responsibility aside from the tort itself"; and (3) "where the defendant's conduct infringed on some legally protected apart from causing the claimed distress, even when that conduct was only negligent." 312 Or. 17, 22–23, 816 P.2d 593 (1991).  The evidence in this record includes correspondence between the Defendant's adjuster and appraiser suggesting that once big ticket items were removed from the appraisal process, the Plaintiffs may walk away.  A jury could conclude from this evidence that Defendant intended to cause Plaintiffs sufficient emotional distress to abandon their claims.  The first and second *Hammond* exceptions are applicable on this record.

//

//

//

//

//

## CONCLUSION

For the reasons above, the Court GRANTS Defendant's motion for summary judgment (ECF No. 25) as to: (1) Plaintiffs' breach of the duty of good faith and fair dealing claim, and (2) all loss of income damages. The Court DENIES Defendant's motion for summary judgment as to: (1) Plaintiffs' breach of contract claim, and (2) Plaintiffs' negligence per se claim.

DATED this 27th day of March 2023.

s/ Mustafa T. Kasubhai
MUSTAFA T. KASUBHAI (He / Him)
United States Magistrate Judge